*PRELIMINARY PRINT*

VOLUME 598 U. S. PART 2
PAGES 631–650

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MAY 25, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# TYLER *v.* HENNEPIN COUNTY, MINNESOTA, et al.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 22–166. Argued April 26, 2023—Decided May 25, 2023

Geraldine Tyler owned a condominium in Hennepin County, Minnesota, that accumulated about $15,000 in unpaid real estate taxes along with interest and penalties. The County seized the condo and sold it for $40,000, keeping the $25,000 excess over Tyler's tax debt for itself. Minn. Stat. §§ 281.18, 282.07, 282.08. Tyler filed suit, alleging that the County had unconstitutionally retained the excess value of her home above her tax debt in violation of the Takings Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment. The District Court dismissed the suit for failure to state a claim, and the Eighth Circuit affirmed.

*Held*: Tyler plausibly alleges that Hennepin County's retention of the excess value of her home above her tax debt violated the Takings Clause. Pp. 636–648.

(a) Tyler's claim that the County illegally appropriated the $25,000 surplus constitutes a classic pocketbook injury sufficient to give her standing. *TransUnion LLC* v. *Ramirez*, 594 U. S. ——, ——. Even if there are debts on her home, as the County claims, Tyler still plausibly alleges a financial harm, for the County has kept $25,000 that she could have used to reduce her personal liability for those debts. Pp. 636–637.

(b) Tyler has stated a claim under the Takings Clause, which provides that "private property [shall not] be taken for public use, without just compensation." Whether remaining value from a tax sale is property protected under the Takings Clause depends on state law, "traditional property law principles," historical practice, and the Court's precedents. *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 165–168. Though state law is an important source of property rights, it cannot be the only one because otherwise a State could "sidestep the Takings Clause by disavowing traditional property interests" in assets it wishes to appropriate. *Id.*, at 167. History and precedent dictate that, while the County had the power to sell Tyler's home to recover the unpaid property taxes, it could not use the tax debt to confiscate more property than was due. Doing so effected a "classic taking in which the government directly appropriates private property for its own use." *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 324 (internal quotation marks omitted).

The principle that a government may not take from a taxpayer more than she owes is rooted in English law and can trace its origins at least as far back as the Magna Carta. From the founding, the new Government of the United States could seize and sell only "so much of [a] tract of land . . . as may be necessary to satisfy the taxes due thereon." Act of July 14, 1798, § 13, 1 Stat. 601. Ten States adopted similar statutes around the same time, and the consensus that a government could not take more property than it was owed held true through the ratification of the Fourteenth Amendment. Today, most States and the Federal Government require excess value to be returned to the taxpayer whose property is sold to satisfy outstanding tax debt.

The Court's precedents have long recognized the principle that a taxpayer is entitled to the surplus in excess of the debt owed. See *United States* v. *Taylor*, 104 U. S. 216; *United States* v. *Lawton*, 110 U. S. 146. *Nelson* v. *City of New York*, 352 U. S. 103, did not change that. The ordinance challenged there did not "absolutely preclud[e] an owner from obtaining the surplus proceeds of a judicial sale," but instead simply defined the process through which the owner could claim the surplus. *Id.,* at 110. Minnesota's scheme, in comparison, provides no opportunity for the taxpayer to recover the excess value from the State.

Significantly, Minnesota law itself recognizes in many other contexts that a property owner is entitled to the surplus in excess of her debt. If a bank forecloses on a mortgaged property, state law entitles the homeowner to the surplus from the sale. And in collecting past due taxes on income or personal property, Minnesota protects the taxpayer's right to surplus. Minnesota may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when the State does the taking. *Phillips,* 524 U. S., at 167. Pp. 637–645.

(c) The Court rejects the County's argument that Tyler has no property interest in the surplus because she constructively abandoned her home by failing to pay her taxes. Abandonment requires the "surrender or relinquishment or disclaimer of" all rights in the property, *Rowe* v. *Minneapolis*, 51 N. W. 907, 908. Minnesota's forfeiture law is not concerned about the taxpayer's use or abandonment of the property, only her failure to pay taxes. The County cannot frame that failure as abandonment to avoid the demands of the Takings Clause. Pp. 646–647.

26 F. 4th 789, reversed.

ROBERTS, C. J., delivered the opinion for a unanimous Court. GORSUCH, J., filed a concurring opinion, in which JACKSON, J., joined, *post,* p. 648.

Counsel

*Christina M. Martin* argued the cause for petitioner. With her on the briefs were *Lawrence G. Salzman, Deborah J. La Fetra, David J. Deerson, Joshua W. Polk, Vildan Teske, Charles R. Watkins,* and *Garrett D. Blanchfield.*

*Erica L. Ross* argued the cause for the United States as *amicus curiae* supporting neither party. With her on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Deputy Assistant Attorney General Hubbert, Deputy Solicitor General Gannon, Alisa B. Klein,* and *Jennifer M. Rubin.*

*Neal Kumar Katyal* argued the cause for respondents. With him on the brief were *Rebecca L. S. Holschuh, Jonathan P. Schmidt, Katherine B. Wellington, Reedy C. Swanson,* and *Nathaniel A. G. Zelinsky.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Utah et al. by *Sean D. Reyes,* Attorney General of Utah, *Melissa Holyoak,* Solicitor General, and *Jordan E. Smith* and *Stephen Tensmeyer,* Special Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Tim Griffin* of Arkansas, *Kris Kobach* of Kansas, *Daniel Cameron* of Kentucky, *Jeff Landry* of Louisiana, *Drew Wrigley* of North Dakota, *Ken Paxton* of Texas, and *Patrick Morrisey* of West Virginia; for AARP et al. by *Julie Nepveu, William Alvarado Rivera, Stuart Rossman,* and *John Rao;* for the Americans for Prosperity Foundation by *Michael Pepson* and *Cynthia Fleming Crawford;* for the Atlantic Legal Foundation by *Lawrence S. Ebner* and *Nancie G. Marzulla;* for the Buckeye Institute et al. by *Robert Alt, David Tryon, Jay Carson, Dan Greenberg, Elizabeth Milito, Rob Smith, Ilya Shapiro,* and *Mailee Smith;* for the Cato Institute et al. by *Clark M. Neily III, Thomas A. Berry, Thomas J. Ward,* and *David D. Cole;* for the Chamber of Commerce of the United States of America by *Steffen N. Johnson, Michael W. McConnell, Jonathan D. Urick,* and *Tyler S. Badgley;* for the Liberty Justice Center by *M. E. Buck Dougherty III;* for the National Association of Realtors® et al. by *Brett A. Shumate;* for the National Legal Aid & Defender Association by *Anuj Vohra* and *Neil Nandi;* for the National Taxpayers Union Foundation et al. by *Joseph D. Henchman, Tyler Martinez,* and *Derk Wilcox;* for New Disabled South et al. by *Paul Koster;* for PioneerLegal, LLC by *Stephanie Schuster;* for Public Citizen by *Wendy Liu, Scott L. Nelson,* and *Allison M. Zieve;* for the Wisconsin Realtors Association by *Thomas D. Larson;* for Ralph D. Clifford by *Mr. Clifford, pro se;* for Tom Emmer

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Hennepin County, Minnesota, sold Geraldine Tyler's home for $40,000 to satisfy a $15,000 tax bill. Instead of returning the remaining $25,000, the County kept it for itself. The question presented is whether this constituted a taking of property without just compensation, in violation of the Fifth Amendment.

et al. by *Donald F. McGahn II, Robert Luther III,* and *Jorge Benjamin Aguiñaga*; and for Monica Toth by *Samuel B. Gedge, Brian A. Morris, Jeffrey P. Wiesner, Jennifer McKinnon,* and *Ari S. Bargil. Elizabeth B. Wydra, Brianne J. Gorod,* and *Brian R. Frazelle* filed a brief for the Constitutional Accountability Center as *amicus curiae* urging vacatur.

Briefs of *amici curiae* urging affirmance were filed for the State of Minnesota et al. by *Keith Ellison,* Attorney General of Minnesota, *Liz Kramer,* Solicitor General, and *Peter J. Farrell* and *Michael Goodwin,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Matthew J. Platkin* of New Jersey and *Ellen F. Rosenblum* of Oregon; for Oakland County, Michigan by *John J. Bursch* and *William H. Horton*; for the Association of Minnesota Counties et al. by *Jay T. Squires* and *Michael J. Ervin*; for the County Treasurers Association of Ohio et al. by *Stephen W. Funk*; for the Local Government Legal Center et al. by *John M. Baker, Katherine M. Swenson, Amanda Karras,* and *Erich Eiselt*; for the Michigan Association of Counties et al. by *Theodore W. Seitz* and *James Azadian*; for the National Tax Lien Association et al. by *Matthew A. Abee, D. Martin Warf,* and *Jonah Dixon Samples*; for the Wisconsin Counties Association by *Matthew J. Thome* and *Andrew T. Phillips*; for Frank S. Alexander by *Scott Gregory Knudson* and *Mr. Alexander, pro se*; and for James J. Kelly, Jr., by *Steven J. Wells, Nicholas J. Bullard,* and *Jessica M. Leano.*

Briefs of *amici curiae* were filed for the Center for Constitutional Jurisprudence by *John C. Eastman* and *Anthony T. Caso*; for the Howard Jarvis Taxpayers Association by *Jonathan M. Coupal, Timothy A. Bittle,* and *Laura E. Dougherty*; for the New England Legal Foundation by *John Pagliaro* and *Daniel B. Winslow*; for Francis J. Coffey by *Nicholas P. Shapiro*; for Beth A. Colgan by *Matthew S. Rozen* and *Ms. Colgan, pro se*; and for David C. Wilkes et al. by *Mr. Wilkes, pro se, Tanya Dwyer,* and *Derek Tarson.*

I

Hennepin County imposes an annual tax on real property. Minn. Stat. §273.01 (2022). The taxpayer has one year to pay before the taxes become delinquent. §279.02. If she does not timely pay, the tax accrues interest and penalties, and the County obtains a judgment against the property, transferring limited title to the State. See §§279.03, 279.18, 280.01. The delinquent taxpayer then has three years to redeem the property and regain title by paying all the taxes and late fees. §§281.17(a), 281.18. During this time, the taxpayer remains the beneficial owner of the property and can continue to live in her home. See §281.70. But if at the end of three years the bill has not been paid, absolute title vests in the State, and the tax debt is extinguished. §§281.18, 282.07. The State may keep the property for public use or sell it to a private party. §282.01 subds. 1a, 3. If the property is sold, any proceeds in excess of the tax debt and the costs of the sale remain with the County, to be split between it, the town, and the school district. §282.08. The former owner has no opportunity to recover this surplus.

Geraldine Tyler is 94 years old. In 1999, she bought a one-bedroom condominium in Minneapolis and lived alone there for more than a decade. But as Tyler aged, she and her family decided that she would be safer in a senior community, so they moved her to one in 2010. Nobody paid the property taxes on the condo in Tyler's absence and, by 2015, it had accumulated about $2300 in unpaid taxes and $13,000 in interest and penalties. Acting under Minnesota's forfeiture procedures, Hennepin County seized the condo and sold it for $40,000, extinguishing the $15,000 debt. App. 5. The County kept the remaining $25,000 for its own use.

Tyler filed a putative class action against Hennepin County and its officials, asserting that the County had unconstitutionally retained the excess value of her home above her tax debt. As relevant, she brought claims under the Takings

Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

The District Court dismissed the suit for failure to state a claim. 505 F. Supp. 3d 879, 883 (Minn. 2020). The Eighth Circuit affirmed. 26 F. 4th 789, 790 (2022). It held that "[w]here state law recognizes no property interest in surplus proceeds from a tax-foreclosure sale conducted after adequate notice to the owner, there is no unconstitutional taking." *Id.*, at 793. The court also rejected Tyler's claim under the Excessive Fines Clause, adopting the District Court's reasoning that the forfeiture was not a fine because it was intended to remedy the State's tax losses, not to punish delinquent property owners. *Id.*, at 794 (citing 505 F. Supp. 3d, at 895–899).

We granted certiorari. 598 U. S. —— (2023).

## II

The County asserts that Tyler does not have standing to bring her takings claim. To bring suit, a plaintiff must plead an injury in fact attributable to the defendant's conduct and redressable by the court. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992). This case comes to us on a motion to dismiss for failure to state a claim. At this initial stage, we take the facts in the complaint as true. *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975). Tyler claims that the County has illegally appropriated the $25,000 surplus beyond her $15,000 tax debt. App. 5. This is a classic pocketbook injury sufficient to give her standing. *TransUnion LLC* v. *Ramirez*, 594 U. S. ——, —— (2021).

The County objects that Tyler does not have standing because she did not affirmatively "disclaim the existence of other debts or encumbrances" on her home worth more than the $25,000 surplus. Brief for Respondents 12–13, and n. 5. According to the County, public records suggest that the condo may be subject to a $49,000 mortgage and a $12,000 lien for unpaid homeowners' association fees. See *ibid.*

The County argues that these potential encumbrances exceed the value of any interest Tyler has in the home above her $15,000 tax debt, and that she therefore ultimately suffered no financial harm from the sale of her home. Without such harm she would have no standing.

But the County never entered these records below, nor has it submitted them to this Court. Even if there were encumbrances on the home worth more than the surplus, Tyler still plausibly alleges a financial harm: The County has kept $25,000 that belongs to her. In Minnesota, a tax sale extinguishes all other liens on a property. See Minn. Stat. § 281.18; *County of Blue Earth* v. *Turtle*, 593 N. W. 2d 258, 261 (Minn. App. 1999). That sale does not extinguish the taxpayer's debts. Instead, the borrower remains personally liable. See *St. Paul* v. *St. Anthony Flats Ltd. Partnership*, 517 N. W. 2d 58, 62 (Minn. App. 1994). Had Tyler received the surplus from the tax sale, she could have at the very least used it to reduce any such liability.

At this initial stage of the case, Tyler need not definitively prove her injury or disprove the County's defenses. She has plausibly pleaded on the face of her complaint that she suffered financial harm from the County's action, and that is enough for now. See *Lujan*, 504 U. S., at 561.

## III

### A

The Takings Clause, applicable to the States through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U. S. Const., Amdt. 5. States have long imposed taxes on property. Such taxes are not themselves a taking, but are a mandated "contribution from individuals . . . for the support of the government . . . for which they receive compensation in the protection which government affords." *County of Mobile* v. *Kimball*, 102 U. S. 691, 703 (1881). In collecting these taxes, the State may impose interest and

late fees.   It may also seize and sell property, including land, to recover the amount owed.   See *Jones* v. *Flowers*, 547 U. S. 220, 234 (2006).   Here there was money remaining after Tyler's home was seized and sold by the County to satisfy her past due taxes, along with the costs of collecting them.   The question is whether that remaining value is property under the Takings Clause, protected from uncompensated appropriation by the State.

The Takings Clause does not itself define property.   *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 164 (1998).   For that, the Court draws on "existing rules or understandings" about property rights.   *Ibid.* (internal quotation marks omitted).   State law is one important source. *Ibid.*; see also *Stop the Beach Renourishment, Inc.* v. *Florida Dept. of Environmental Protection*, 560 U. S. 702, 707 (2010).   But state law cannot be the only source.   Otherwise, a State could "sidestep the Takings Clause by disavowing traditional property interests" in assets it wishes to appropriate.   *Phillips*, 524 U. S., at 167; see also *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 164 (1980); *Hall* v. *Meisner*, 51 F. 4th 185, 190 (CA6 2022) (Kethledge, J., for the Court) ("[T]he Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take.").   So we also look to "traditional property law principles," plus historical practice and this Court's precedents. *Phillips*, 524 U. S., at 165–168; see, *e. g.*, *United States* v. *Causby*, 328 U. S. 256, 260–267 (1946); *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1001–1004 (1984).

Minnesota recognizes a homeowner's right to real property, like a house, and to financial interests in that property, like home equity.   Cf. *Armstrong* v. *United States*, 364 U. S. 40, 44 (1960) (lien on boats); *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555, 590 (1935) (mortgage on farm).   Historically, Minnesota also recognized that a homeowner whose property has been sold to satisfy delinquent property taxes had an interest in the excess value of her

home above the debt owed. See *Farnham* v. *Jones*, 32
Minn. 7, 11, 19 N. W. 83, 85 (1884). But in 1935, the State
purported to extinguish that property interest by enacting
a law providing that an owner forfeits her interest in her
home when she falls behind on her property taxes. See
1935 Minn. Laws pp. 713–714, §8. This means, the County
reasons, that Tyler has no property interest protected by the
Takings Clause.

History and precedent say otherwise. The County had
the power to sell Tyler's home to recover the unpaid prop-
erty taxes. But it could not use the toehold of the tax debt
to confiscate more property than was due. By doing so,
it effected a "classic taking in which the government directly
appropriates private property for its own use." *Tahoe-
Sierra Preservation Council, Inc.* v. *Tahoe Regional Plan-
ning Agency*, 535 U. S. 302, 324 (2002) (internal quotation
marks and alteration omitted). Tyler has stated a claim
under the Takings Clause and is entitled to just compensation.

B

The principle that a government may not take more from
a taxpayer than she owes can trace its origins at least as far
back as Runnymede in 1215, where King John swore in
Magna Carta that when his sheriff or bailiff came to collect
any debts owed him from a dead man, they could remove
property "until the debt which is evident shall be fully paid
to us; and the residue shall be left to the executors to fulfil
the will of the deceased." W. McKechnie, Magna Carta, A
Commentary on the Great Charter of King John, ch. 26, p.
322 (rev. 2d ed. 1914) (footnote omitted).

That doctrine became rooted in English law. Parliament
gave the Crown the power to seize and sell a taxpayer's
property to recover a tax debt, but dictated that any "Over-
plus" from the sale "be immediately restored to the Owner."
4 W. & M., ch. 1, §12, in 3 Eng. Stat. at Large 488–489 (1692).
As Blackstone explained, the common law demanded the
same: If a tax collector seized a taxpayer's property, he was

"bound by an implied contract in law to restore [the property] on payment of the debt, duty, and expenses, before the time of sale; or, when sold, to render back the overplus." 2 Commentaries on the Laws of England 453 (1771).

This principle made its way across the Atlantic. In collecting taxes, the new Government of the United States could seize and sell only "so much of [a] tract of land . . . as may be necessary to satisfy the taxes due thereon." Act of July 14, 1798, § 13, 1 Stat. 601. Ten States adopted similar statutes shortly after the founding.[1] For example, Maryland required that only so much land be sold "as may be sufficient to discharge the taxes thereon due," and provided that if the sale produced more than needed for the taxes, "such overplus of money" shall be paid to the owner. 1797 Md. Laws ch. 90, §§ 4–5. This Court enforced one such state statute against a Georgia tax collector, reasoning that "if a whole tract of land was sold when a small part of it would have been sufficient for the taxes, which at present appears to be the case, the collector unquestionably exceeded his authority." *Stead's Executors* v. *Course,* 4 Cranch 403, 414 (1808) (Marshall, C. J., for the Court).

Like its sister States, Virginia originally provided that the Commonwealth could seize and sell "so much" of the delinquent tracts "as shall be sufficient to discharge the said taxes." 1781 Va. Acts p. 153, § 4. But about a decade later, Virginia enacted a new scheme, which provided for the forfeiture of any delinquent land to the Commonwealth. Virginia passed this harsh forfeiture regime in response to the

---

[1] 1796 Conn. Acts pp. 356–357, §§ 32, 36; 1797 Del. Laws p. 1260, § 26; 1791 Ga. Laws p. 14; 1801 Ky. Acts pp. 78–79, § 4; 1797 Md. Laws ch. 90, §§ 4–5; 1786 Mass. Acts pp. 360–361; 1792 N. H. Laws p. 194; 1792 N. C. Sess. Laws p. 23, § 5; 1801 N. Y. Laws pp. 498–499, § 17; 1787 Vt. Acts & Resolves p. 126. Kentucky made an exception for unregistered land, or land that the owner had "fail[ed] to list . . . for taxation," with such land forfeiting to the Commonwealth. 1801 Ky. Acts p. 80, § 5.

"loose, cheap and unguarded system of disposing of her pub-
lic lands" that the Commonwealth had adopted immediately
following statehood. *McClure* v. *Maitland*, 24 W. Va. 561,
564 (1884). To encourage settlement, Virginia permitted
"any person [to] acquire title to so much . . . unappropriated
lands as he or she shall desire to purchase" at the price of 40
pounds per 100 acres. 1779 Va. Acts p. 95, §2. Within two
decades, nearly all of Virginia's land had been claimed, much
of it by nonresidents who did not live on or farm the land
but instead hoped to sell it for a profit. *McClure*, 24 W. Va.,
at 564. Many of these nonresidents "wholly neglected to
pay the taxes" on the land, *id.*, at 565, so Virginia provided
that title to any taxpayer's land was completely "lost, for-
feited and vested in the Commonwealth" if the taxpayer
failed to pay taxes within a set period, 1790 Va. Acts p. 5, §5.
This solution was short lived, however; the Commonwealth
repealed the forfeiture scheme in 1814 and once again sold
"so much only of each tract of land . . . as will be sufficient
to discharge the" debt. 1813 Va. Acts p. 21, §27. Virginia's
"exceptional" and temporary forfeiture scheme carries little
weight against the overwhelming consensus of its sister
States. See *Martin* v. *Snowden*, 59 Va. 100, 138 (1868).

The consensus that a government could not take more
property than it was owed held true through the passage of
the Fourteenth Amendment. States, including Minnesota,
continued to require that no more than the minimum amount
of land be sold to satisfy the outstanding tax debt.[2] The

---

[2] Many of these new States required that the land be sold to whichever
buyer would "pay [the tax debt] for the least number of acres" and pro-
vided that the land forfeited to the State only if it failed to sell "for the
want of bidders" because the land was worth less than the taxes owed.
1821 Ohio Laws pp. 27–28, §§ 7, 10; see also 1837 Ark. Acts pp. 14–17, §§ 83,
100; 1844 Ill. Laws pp. 13, 18, §§ 51, 77; 1859 Minn. Laws pp. 58, 61, §§ 23,
38; 1859 Wis. Laws ch. 22, pp. 22–23, §§ 7, 9; cf. Iowa Code pp. 120–121,
§§ 766, 773 (1860) (requiring that property be offered for sale "until all the
taxes shall have been paid"); see also *O'Brien* v. *Coulter*, 2 Blackf. 421, 425

County identifies just three States that deemed delinquent property entirely forfeited for failure to pay taxes. See 1836 Me. Laws p. 325, § 4; 1869 La. Acts p. 159, § 63; 1850 Miss. Laws p. 52, § 4.[3] Two of these laws did not last. Maine amended its law a decade later to permit the former owner to recover the surplus. 1848 Me. Laws p. 56, § 4. And Mississippi's highest court promptly struck down its law for violating the Due Process and Takings Clauses of the Mississippi Constitution. See *Griffin* v. *Mixon*, 38 Miss. 424, 439, 451–452 (Ct. Err. & App. 1860). Louisiana's statute remained on the books, but the County cites no case showing that the statute was actually enforced against a taxpayer to take his entire property.

The minority rule then remains the minority rule today: Thirty-six States and the Federal Government require that the excess value be returned to the taxpayer.

C

Our precedents have also recognized the principle that a taxpayer is entitled to the surplus in excess of the debt owed. In *United States* v. *Taylor*, 104 U. S. 216 (1881), an Arkansas taxpayer whose property had been sold to satisfy a tax debt sought to recover the surplus from the sale. A nationwide tax had been imposed by Congress in 1861 to raise funds for the Civil War. Under that statute, if a taxpayer did not pay, his property would be sold and "the surplus of the proceeds of the sale [would] be paid to the owner." Act of Aug. 5, 1861, § 36, 12 Stat. 304. The next year, Congress added a 50 percent penalty in the rebelling States, but made no mention

---

(Ind. 1831) (*per curiam*) ("[S]o much only of the defendant's property shall be sold at one time, as a sound judgment would dictate to be sufficient to pay the debt.").

[3] North Carolina amended its laws in 1842 to permit the forfeiture of unregistered "swamp lands," 1842 N. C. Sess. Laws p. 64, § 1, but otherwise continued to follow the majority rule, see 1792 N. C. Sess. Laws p. 23, § 5.

of the owner's right to surplus after a tax sale. See Act of June 7, 1862, §1, 12 Stat. 422. Taylor's property had been sold for failure to pay taxes under the 1862 Act, but he sought to recover the surplus under the 1861 Act. Though the 1862 Act "ma[de] no mention of the right of the owner of the lands to receive the surplus proceeds of their sale," we held that the taxpayer was entitled to the surplus because nothing in the 1862 Act took "from the owner the right accorded him by the act of 1861, of applying for and receiving from the treasury the surplus proceeds of the sale of his lands." *Taylor*, 104 U. S., at 218–219.

We extended a taxpayer's right to surplus even further in *United States* v. *Lawton*, 110 U. S. 146 (1884). The property owner had an unpaid tax bill under the 1862 Act for $170.50. *Id.*, at 148. The Federal Government seized the taxpayer's property and, instead of selling it to a private buyer, kept the property for itself at a value of $1100. *Ibid.* The property owner sought to recover the excess value from the Government, but the Government refused. *Ibid.* The 1861 Act explicitly provided that any surplus from tax sales to private parties had to be returned to the owner, but it did not mention paying the property owner the excess value where the Government *kept* the property for its own use instead of selling it. See 12 Stat. 304. We held that the taxpayer was still entitled to the surplus under the statute, just as if the Government had sold the property. *Lawton*, 110 U. S., at 149–150. Though the 1861 statute did not explicitly provide the right to the surplus under such circumstances, "[t]o withhold the surplus from the owner would be to violate the Fifth Amendment to the Constitution and to deprive him of his property without due process of law, or to take his property for public use without just compensation." *Id.*, at 150.

The County argues that *Taylor* and *Lawton* were superseded by *Nelson* v. *City of New York*, 352 U. S. 103 (1956), but that case is readily distinguished. There New York City

foreclosed on properties for unpaid water bills. Under the governing ordinance, a property owner had almost two months after the city filed for foreclosure to pay off the tax debt, and an additional 20 days to ask for the surplus from any tax sale. *Id.*, at 104–105, n. 1. No property owner requested his surplus within the required time. The owners later sued the city, claiming that it had denied them due process and equal protection of the laws. *Id.*, at 109. In their reply brief before this Court, the owners also argued for the first time that they had been denied just compensation under the Takings Clause. *Ibid.*

We rejected this belated argument. *Lawton* had suggested that withholding the surplus from a property owner always violated the Fifth Amendment, but there was no specific procedure there for recovering the surplus. *Nelson*, 352 U. S., at 110. New York City's ordinance, in comparison, permitted the owner to recover the surplus but required that the owner have "filed a timely answer in [the] foreclosure proceeding, asserting his property had a value substantially exceeding the tax due." *Ibid.* (citing *New York* v. *Chapman Docks Co.*, 1 App. Div. 2d 895, 149 N. Y. S. 2d 679 (1956)). Had the owners challenging the ordinance done so, "a separate sale" could have taken place "so that [they] might receive the surplus." 352 U. S., at 110. The owners did not take advantage of this procedure, so they forfeited their right to the surplus. Because the New York City ordinance did not "absolutely preclud[e] an owner from obtaining the surplus proceeds of a judicial sale," but instead simply defined the process through which the owner could claim the surplus, we found no Takings Clause violation. *Ibid.*

Unlike in *Nelson*, Minnesota's scheme provides no opportunity for the taxpayer to recover the excess value; once absolute title has transferred to the State, any excess value always remains with the State. The County argues that the delinquent taxpayer could sell her house to pay her tax debt

before the County itself seizes and sells the house. But requiring a taxpayer to sell her house to avoid a taking is not the same as providing her an opportunity to recover the excess value of her house once the State has sold it.

D

Finally, Minnesota law itself recognizes that in other contexts a property owner is entitled to the surplus in excess of her debt. Under state law, a private creditor may enforce a judgment against a debtor by selling her real property, but "[n]o more shall be sold than is sufficient to satisfy" the debt, and the creditor may receive only "so much [of the proceeds] as will satisfy" the debt. Minn. Stat. §§ 550.20, 550.08 (2022). Likewise, if a bank forecloses on a home because the homeowner fails to pay the mortgage, the homeowner is entitled to the surplus from the sale. § 580.10.

In collecting all other taxes, Minnesota protects the taxpayer's right to surplus. If a taxpayer falls behind on her income tax and the State seizes and sells her property, "[a]ny surplus proceeds . . . shall . . . be credited or refunded" to the owner. §§ 270C.7101, 270C.7108, subd. 2. So too if a taxpayer does not pay taxes on her personal property, like a car. § 277.21, subd. 13. Until 1935, Minnesota followed the same rule for the sale of real property. The State could sell only the "least quantity" of land sufficient to satisfy the debt, 1859 Minn. Laws p. 58, § 23, and "any surplus realized from the sale must revert to the owner," *Farnham*, 32 Minn., at 11, 19 N. W., at 85.

The State now makes an exception only for itself, and only for taxes on real property. But "property rights cannot be so easily manipulated." *Cedar Point Nursery* v. *Hassid*, 594 U. S. ——, —— (2021) (internal quotation marks omitted). Minnesota may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking. *Phillips*, 524 U. S., at 167.

## IV

The County argues that Tyler has no interest in the surplus because she constructively abandoned her home by failing to pay her taxes. States and localities have long imposed "reasonable conditions" on property ownership. *Texaco, Inc.* v. *Short,* 454 U. S. 516, 526 (1982). In Minnesota, one of those conditions is paying property taxes. By neglecting this reasonable condition, the County argues, the owner can be considered to have abandoned her property and is therefore not entitled to any compensation for its taking. See Minn. Stat. § 282.08.

The County portrays this as just another example in the long tradition of States taking title to abandoned property. We upheld one such statutory scheme in *Texaco.* There, Indiana law dictated that a mineral interest automatically reverted to the owner of the land if not used for 20 years. 454 U. S., at 518. Use included excavating minerals, renting out the right to excavate, paying taxes, or simply filing a "statement of claim with the local recorder of deeds." *Id.,* at 519. Owners who lost their mineral interests challenged the statute as unconstitutional. We held that the statute did not violate the Takings Clause because the State "has the power to condition the permanent retention of [a] property right on the performance of reasonable conditions that indicate a *present intention to retain the interest.*" *Id.,* at 526 (emphasis added). Indiana reasonably "treat[ed] a mineral interest that ha[d] not been used for 20 years and for which no statement of claim ha[d] been filed as abandoned." *Id.,* at 530. There was thus no taking, for "after abandonment, the former owner retain[ed] no interest for which he may claim compensation." *Ibid.*

The County suggests that here, too, Tyler constructively abandoned her property by failing to comply with a reasonable condition imposed by the State. But the County cites no case suggesting that failing to pay property taxes is it-

self sufficient for abandonment. Cf. *Krueger* v. *Market*, 124 Minn. 393, 397, 145 N. W. 30, 32 (1914) (owner did not abandon property despite failing to pay taxes for 30 years). Abandonment requires the "surrender or relinquishment or disclaimer of" all rights in the property. *Rowe* v. *Minneapolis*, 49 Minn. 148, 157, 51 N. W. 907, 908 (1892). "It is the owner's failure to make *any* use of the property"—and for a lengthy period of time—"that causes the lapse of the property right." *Texaco*, 454 U. S., at 530 (emphasis added). In *Texaco*, the owners lost their property because they made *no* use of their interest for 20 years and then failed to take the simple step of filing paperwork indicating that they still claimed ownership over the interest. In comparison, Minnesota's forfeiture scheme is not about abandonment at all. It gives no weight to the taxpayer's use of the property. Indeed, the delinquent taxpayer can continue to live in her house for years after falling behind in taxes, up until the government sells it. See §281.70. Minnesota cares only about the taxpayer's failure to contribute her share to the public fisc. The County cannot frame that failure as abandonment to avoid the demands of the Takings Clause.

\*     \*     \*

The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U. S., at 49. A taxpayer who loses her $40,000 house to the State to fulfill a $15,000 tax debt has made a far greater contribution to the public fisc than she owed. The taxpayer must render unto Caesar what is Caesar's, but no more.

Because we find that Tyler has plausibly alleged a taking under the Fifth Amendment, and she agrees that relief under "the Takings Clause would fully remedy [her] harm," we need not decide whether she has also alleged an excessive

fine under the Eighth Amendment. Tr. of Oral Arg. 27. The judgment of the Court of Appeals for the Eighth Circuit is reversed.

*It is so ordered.*

JUSTICE GORSUCH, with whom JUSTICE JACKSON joins, concurring.

The Court reverses the Eighth Circuit's dismissal of Geraldine Tyler's suit and holds that she has plausibly alleged a violation of the Fifth Amendment's Takings Clause. I agree. Given its Takings Clause holding, the Court understandably declines to pass on the question whether the Eighth Circuit committed a further error when it dismissed Ms. Tyler's claim under the Eighth Amendment's Excessive Fines Clause. *Ante*, at 647–648. But even a cursory review of the District Court's excessive-fines analysis—which the Eighth Circuit adopted as "well-reasoned," 26 F. 4th 789, 794 (2022)—reveals that it too contains mistakes future lower courts should not be quick to emulate.

*First*, the District Court concluded that the Minnesota tax-forfeiture scheme is not punitive because "its primary purpose" is "remedial"—aimed, in other words, at "compensat[ing] the government for lost revenues due to the nonpayment of taxes." 505 F. Supp. 3d 879, 896 (Minn. 2020). That primary-purpose test finds no support in our law. Because "sanctions frequently serve more than one purpose," this Court has said that the Excessive Fines Clause applies to *any* statutory scheme that "serv[es] *in part* to punish." *Austin* v. *United States*, 509 U. S. 602, 610 (1993) (emphasis added). It matters not whether the scheme has a remedial purpose, even a predominantly remedial purpose. So long as the law "cannot fairly be said *solely* to serve a remedial purpose," the Excessive Fines Clause applies. *Ibid.* (emphasis added; internal quotation marks omitted). Nor, this Court has held, is it appropriate to label sanctions as "reme-

dial" when (as here) they bear "'no correlation to any damages sustained by society or to the cost of enforcing the law,'" and "any relationship between the Government's actual costs and the amount of the sanction is merely coincidental." *Id.*, at 621–622, and n. 14.

*Second*, the District Court asserted that the Minnesota tax-forfeiture scheme cannot "be punitive because it actually confers a windfall on the delinquent taxpayer when the value of the property that is forfeited is less than the amount of taxes owed." 505 F. Supp. 3d, at 896. That observation may be factually true, but it is legally irrelevant. Some prisoners better themselves behind bars; some addicts credit court-ordered rehabilitation with saving their lives. But punishment remains punishment all the same. See Tr. of Oral Arg. 61. Of course, no one thinks that an individual who profits from an economic penalty has a *winning* excessive-fines claim. But nor has this Court ever held that a scheme producing fines that punishes some individuals can escape constitutional scrutiny merely because it does not punish others.

*Third*, the District Court appears to have inferred that the Minnesota scheme is not "punitive" because it does not turn on the "culpability" of the individual property owner. 505 F. Supp. 3d, at 897. But while a focus on "culpability" can sometimes make a provision "look more like punishment," this Court has never endorsed the converse view. *Austin*, 509 U. S., at 619. Even without emphasizing culpability, this Court has said a statutory scheme may still be punitive where it serves another "goal of punishment," such as "[d]eterrence." *United States* v. *Bajakajian*, 524 U. S. 321, 329 (1998). And the District Court expressly approved the Minnesota tax-forfeiture scheme in this case in large part because "'the ultimate possibility of loss of property serves as a *deterrent* to those taxpayers considering tax delinquency.'" 505 F. Supp. 3d, at 899 (emphasis added). Eco-

nomic penalties imposed to deter willful noncompliance with the law are fines by any other name. And the Constitution has something to say about them: They cannot be excessive.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication
and citation style of the United States Reports. The revised pagination
makes available the official United States Reports citation in advance of
publication. The syllabus has been prepared by the Reporter of Decisions
for the convenience of the reader and constitutes no part of the opinion of
the Court. A list of counsel who argued or filed briefs in this case, and
who were members of the bar of this Court at the time this case was
argued, has been inserted following the syllabus. Other revisions may
include adjustments to formatting, captions, citation form, and any errant
punctuation. The following additional edits were made:

p. 639, line 15 from bottom, "Runnymeade" is changed to "Runnymede"
p. 639, line 15 from bottom, "the" is deleted
p. 639, line 9 from bottom, "Charter" is inserted after "Great"
p. 640, n. 1, last line, "State" is changed to "Commonwealth"
p. 641, n. 2, line 3, "the" is inserted after "for"
p. 641, n. 2, line 5, "Laws" is inserted after "Ohio"